IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

THOMAS STEWART, II, et al.        :        CIVIL ACTION
                                  :
            v.                    :
                                  :
PEMBERTON TOWNSHIP                :        NO. 14-6810

MEMORANDUM

Bartle, J.                                March 29, 2022

Plaintiffs are thirty patrol officers and sergeants in the police department of Pemberton Township in Burlington County, New Jersey.[1]  They seek damages from the Township[2] for unpaid overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203 et seq.  They allege that between October 30, 2011, and November 8, 2013, they carried out pre- and post-shift work, such as setting up their patrol cars and gathering their equipment, for which they were not compensated.[3]  The court held

_____

1.    Plaintiff patrol officers are Thomas Stewart II, Shannon Fallen, Robert A. Shinn, Jason Luis, Arthur H. Shinn, John Hall, Daniel Matthews, Anthony Luster, Wayne Davis, Vincent Cestare, Jason M. Gant, Michael C. Brewer, Bruce J. Phillips, Sean Smith, Shannon LaGraff, Thomas Lucas, Andre Byrd, Perry J. Doyle, Robert Hood, Kenneth M. Volk, John P. Laffan, Shaun Myers, Michael Bennett, David Sawyer, Charles Bennett, Stephen Price, and Justin Kreig.  Plaintiff patrol sergeants are David Geibel Jr., Michael Geibel, and Peter DeLaGarza.  Two patrol officers, Edward N. White and Jonathan R. Glass, were dismissed as plaintiffs pursuant to the parties' pretrial stipulation.

2.    Plaintiffs named as defendants Pemberton Township and David Patriarca, the Township's Mayor.  Patriarca has been dismissed from the suit pursuant to the parties' stipulation.

3.    In their fourth amended complaint, plaintiffs also alleged that the Township unlawfully retaliated against them after they

a four-day nonjury trial.  The following are the court's
findings of fact and conclusions of law.

I

Under the FLSA, an employer must compensate its
employees at a rate of one and one-half times their salary for
overtime work.  A public agency must award overtime pay to law
enforcement officers for any work they complete in excess of
eighty-six hours over a two-week period.  See 29 U.S.C.
§ 209(a)(1), (k)(1).

FLSA plaintiffs bear the burden of proving they
performed unpaid work.  E.g., Alers v. City of Philadelphia,
919 F. Supp. 2d 528, 558 (E.D. Pa. 2013).  However, an employer
need only pay its employees for work it "suffers or permits."
Id. at 559 (quoting Holzapfel v. Town of Newburgh, 145 F.3d 516,
524 (2d Cir. 1998)).  Thus, the plaintiffs must demonstrate that
their employer had actual or constructive knowledge that
uncompensated work was taking place.  Id. at 558.  If the
plaintiffs offer evidence of uncompensated overtime work and the
employer's actual or constructive awareness, the burden of proof
shifts to the employer to provide evidence of the exact time the

---

filed their initial complaint.  The court granted the motion of
the Township for summary judgment as to that claim.  See Stewart
v. Pemberton Twp., Civ. A. No. 14-6810, 2020 WL 5040602, at *6-8
(D.N.J. Aug. 26, 2020).

plaintiffs worked or evidence that otherwise discredits the
plaintiffs' evidence.  Id.

                                    II

        Plaintiffs comprise twenty-seven patrol officers and
three patrol sergeants who served in the Pemberton Township
Police Department between 2011 and 2013.  At all relevant times,
plaintiffs worked during one of two shifts, either from 7 A.M.
to 7 P.M. or from 7 P.M. to 7 A.M.  The police department
headquarters exists in a wing of a single-story building that
houses each of the Township's municipal departments.  Each
patrol officer and sergeant parks in the same adjoining parking
lot and reports to duty in the municipal building.

        Plaintiffs claim, as noted above, that between
October 30, 2011, and November 8, 2013, they were required to
perform pre-shift and post-shift work for which they were not
compensated.  Plaintiff patrol officers assert that they carried
out twenty minutes of work before their shifts to set up their
patrol cars and equipment and ten minutes of work after their
shifts to put the equipment away and resolve administrative
matters.  Plaintiff patrol sergeants claim to have worked
twenty-five minutes before and fifteen minutes after their
shifts.  Plaintiffs seek compensation for this off-the-clock
work to the extent it exceeded eighty-six hours of work in a
two-week period.

                                   -3-

The police department has in the past adopted policies that required officers to prepare their vehicle's dashboard camera, known as the mobile vision recording ("MVR") system, before the start of their shifts.  First, in 2000, the Township adopted the following policy:

> Prior to the start of each shift the officer assigned to patrol duties and in a vehicle equipped with MVR equipment shall determine whether the MVR equipment is working satisfactorily and shall bring any problems to the attention of the shift supervisor.

The Township updated the policy in 2006:

> Prior to the start of each shift the officer assigned to patrol duties and in a vehicle equipped with Arbitrator video recording system shall determine whether the MVR equipment is working satisfactorily and shall bring any problems to the attention of the shift supervisor. The functional check shall include both audio and video components.

Since 2010, however, the Township has maintained a timeclock policy that prohibits its employees from completing any work in the seven-minute windows before and after their shifts:

> Employees are required to 'clock in' and 'clock out' at their scheduled times.

> As a convenience to employees, employees may clock in up to 7 minutes prior to the start of their scheduled work time. However, employees shall not engage in any work during that time. In such cases, the employee will not be compensated for the

-4-

time on the clock until the start of the
employee's scheduled work time.

Likewise, employees may clock out up to
7 minutes after the end of their scheduled
work time. However, employees shall not
engage in any work during the time after the
end of their shift. In such cases, the
employee will not be compensated for the
time on the clock after the end of the
employee's scheduled work time.

In both cases, an employee will be
compensated for work performed before and
after the employee's scheduled work time
only for actual work (and subject to the
rounding policy). Actual work may only be
performed if overtime has been expressly
approved by the employee's supervisor in
accordance with overtime approval
procedures.

The precipitating event in this action occurred on

October 31, 2013, at around 6:50 A.M. when Pemberton Township

Police Department patrol officer Robert Hood, a plaintiff here,

slipped and fell on the steps of the municipal building while

walking out to set up his vehicle.  He suffered a sprained

ankle.  The Township investigated his injury and determined that

for worker's compensation purposes it had not taken place while

he was working since his shift did not begin until 7 A.M.

That determination triggered a nasty battle between

the Township and the police union.  Following Hood's injury, the

Township Administrator, Dennis Gonzalez, made inquiries of the

police department to determine how and why Hood was performing

pre-shift work.  The department conducted an internal affairs

-5-

investigation into whether officers violated Township policy by completing pre- and post-shift work.  The results of the investigation were inconclusive.

All this culminated in the plaintiffs filing their initial complaint against the Township in this court on October 30, 2014.  A week later, David Jantas, the chief of police at the time, issued a "special order" which reiterated that police personnel should not complete off-the-clock work:

> No member shall perform, and no Sergeant O/C shall permit, any member to perform any actual work, or function that may be considered and/or construed to be work related prior to the precise starting time of any shift or after the precise ending time of any shift.

The court held a four-day bench trial.  Plaintiffs offered testimony from three representative plaintiffs:  two patrol officers, Hood and Shaun Myers, and one patrol sergeant, David Geibel.  Plaintiffs also offered testimony from Scott Bogdanowicz, a lieutenant in the patrol division during the relevant events of this action.  In addition, they read into evidence the deposition of Robert Lewandowski, the Township's chief of police from 2007 through 2010, as he was not available to testify.  The Township called former and current members of its administration as witnesses.  They elicited testimony from Jantas; David Patriarca, the Township's mayor; Robert King, the Township's chief of police at the time of trial; and two former

Township business administrators, Christopher Vaz and David
Gonzalez.

During trial, the parties entered a stipulation on the
calculation of damages.  The purpose was to streamline the
admission of wage history into evidence.  The agreement read,
"in the event the Court finds liability against [the Township]
for unpaid overtime . . . damages are $26,308.67," which is a
figure based on plaintiffs' wage calculation expert's report.
That amount includes all damages sustained between October 30,
2011, and November 8, 2013.

As discussed below, plaintiffs must show in addition
to liability that the Township willfully violated the FLSA to
the extent they seek to recover damages for the period between
October 30, 2011, and October 29, 2012, which is three years
prior to the filing of the initial complaint.  Likewise,
plaintiffs must prove the Township's willfulness in order to
collect liquidated damages, which are not included in the above
figure.  The stipulation still permits the Township to argue
that it was not liable, or alternatively that it did not act
willfully so that plaintiffs would not be entitled to liquidated
damages.  Likewise, the stipulation permits the Township to
argue that the statute of limitations bars damages for the
period between October 30, 2011, and October 29, 2012.

III

Plaintiffs first rely on the testimony of their representative plaintiffs--two patrol officers and one patrol sergeant--to demonstrate that patrol officers and patrol sergeants engaged in off-the-clock work.  Our Court of Appeals has endorsed this use of "testimony and evidence of representative employees" to "establish prima facie proof of a pattern and practice of FLSA violations."  E.g., Hughes v. Twp. of Franklin, Civ. A. No. 13-3761, 2015 WL 9462965, at *5 (D.N.J. Dec. 23, 2015) (quoting Martin v. Selker Bros., 949 F.2d 1286, 1298 (3d Cir. 1991)).

Hood and Myers testified that as patrol officers, they completed pre-shift work.  During that period, they retrieved long guns from an armory inside the police department headquarters and placed them into their patrol cars.  They also inspected their vehicles' exteriors for damage, checked the front passenger compartments for any property left by the last officers to use the cars, inspected the rear passenger compartments for any contraband left by suspects transported in the cars, and confirmed that their patrol cars contained road flares and emergency oxygen equipment.  After preparing their patrol cars, they tested their MVR systems, following a fourteen-point checklist, to ensure they were working properly.

Once all those steps were completed, they would proceed inside to attend the police department's 7 A.M. or 7 P.M. roll call.

Hood conceded on cross-examination that preparing his car only took him five to seven minutes and that the MVR system set-up took another five.  On the other hand, Myers insisted that completing all pre-shift tasks took "a totality" of twenty minutes each day.  Neither Hood nor Myers spoke of performing any post-shift work.

Plaintiffs also rely on the testimony of Scott Bogdanowicz, who was a lieutenant with the Township's police department during the relevant events in this action. Bogdanowicz estimated that three-quarters of the patrol officers completed uncompensated pre-shift work.  He personally witnessed patrol officers carrying out pre-shift work on several occasions.  Such pre-shift work would "at best" take ten minutes to complete.  Setting up the MVR took five minutes.  The other tasks, including loading equipment and inspecting vehicles, took five minutes as well.

In addition, plaintiffs cite the testimony of several witnesses to show that patrol officers were trained to complete this work.  Hood and Myers each testified that as patrol officers they were obligated under implied orders to carry out pre- and post-shift work.  Hood likened his off-the-clock work to his experience in the military in which "there are both

-9-

specific and implied orders to get missions accomplished."  Hood and Myers both said their training officers taught them that they needed to prepare their patrol cars, set up their MVRs, and gather their equipment before attending lineup at the start of their shifts.  Lewandowski, the Township's police chief from 2007 through 2010, corroborated in his deposition testimony that it was "cultural knowledge" that patrol officers were expected to work before their shifts began so that they would be ready to leave the station immediately after lineup.  He said that pre-shift work "was instilled in me and I instilled [it] in my people."  Bogdanowicz confirmed that before the 2010 timeclock policy was enacted, it was understood that officers were required to complete certain tasks before shift lineup.  When he was a young officer, his field training officer taught him to ready his car and equipment before the 7 A.M. lineup.  In turn, before he became a lieutenant, he trained officers the same way.  By the time the 2010 timeclock policy was enacted, he had been promoted to lieutenant and instructed officers not to work off-the-clock.  However, the patrol officers did so anyway.

As for patrol sergeants, plaintiffs called David Geibel.  He stated that his pre-shift work included speaking with the prior shift's patrol sergeant about "turnover from pertinent calls," downed equipment, and other relevant matters carrying over from the prior shift.  He inspected the station's

jail cells to ensure "there's no contraband, make sure toilets, lights, the locking mechanisms were working at the time, make sure the camera's recording, . . . fill out a log sheet, [and] do a check of the shackles and the belts that were for the prisoners." He then performed the MVR check and inspected his vehicle. All told, he arrived between forty and forty-five minutes before each shift to complete the above tasks.

Geibel recounted that he also completed post-shift work. After his shift he returned his equipment--his long gun, his cellphone, the keys to his squad car--to the appropriate places within police headquarters. He ensured "any incomplete reports were submitted in the incomplete bins." He also stayed until all patrol officers "were back off the road and accounted for." He completed those tasks in "anywhere from five to ten minutes."

Plaintiffs point to the deposition testimony of Lewandowski to confirm that sergeants performed pre- and post-shift work. As a patrol sergeant in the 1990s, he arrived for his shifts early to speak with the outgoing sergeant about the events of the prior shift and any outstanding matters that he needed to address. After his shifts ended, he completed some "police housekeeping stuff." This included putting his patrol officers' long guns away in the armory, reviewing their reports, and signing any necessary forms.

Bogdanowicz recounted his experience as a patrol sergeant before he was promoted to lieutenant in 2007.  He arrived for his shift "between 15 to 20 minutes early."  During that time he shared information with the prior shift's supervisor and sometimes prepared equipment for the patrol officers working during his shift.  He acknowledged, however, that by 2011 the department had obtained a computer system that allowed sergeants to share information between shifts more quickly.  He noted that it was his "choice" to arrive early and that he was never ordered to do so.

Plaintiffs maintain the trial testimony confirms that the Township had actual knowledge of this off-the-clock work taking place.  Plaintiffs contend Jantas as police chief was aware that patrol officers were working before their shifts.  Bogdanowicz testified that he informed Jantas of the pre-shift work taking place in multiple conversations.  Bogdanowicz also said that Jantas had arrived early to witness the pre-shift work taking place during the morning shift change at least once.  Plaintiffs further argue that the court may impute the knowledge of Jantas to the Township.

The Township challenges the plaintiffs' evidence.  It primarily relies on the testimony of David Jantas, the chief of police during the relevant events of this suit.  Like Lewandowski, Jantas rose through the ranks of the Township's

police department from patrol officer, to sergeant, to
lieutenant, until he was appointed chief of police in 2010.
Jantas stated that in all those capacities, he never completed
pre- or post-shift work nor witnessed it taking place.  As to
the patrol sergeants, the Township cites Bogdanowicz's testimony
that patrol sergeants rarely completed post-shift work.
According to Bogdanowicz, if he had to stay past his shift's
end, such as when "there were prisoners in the station" or he
was "typing up complaints," he received overtime compensation.

 The Township also maintains that even if patrol
officers and sergeants did complete off-the-clock work, the
Township lacked knowledge that it was taking place.  Jantas
maintained that he was unaware of the work taking place.  Mayor
Patriarca and David Gonzalez, the Township's business
administrator during the relevant events in question, also
testified that they were unaware of any off-the-clock work
taking place until Hood's injury.  The Township contends that
only the knowledge of Mayor Patriarca can be imputed to the
Township for FLSA purposes because he is the "appropriate
authority" responsible for establishing workplace regulations
within the police department under New Jersey law.  See N.J.
Stat. Ann. § 40A:14-118.

 The Township further argues that the 2010 timeclock
policy specifically prohibited patrol officers and sergeants

-13-

from completing off-the-clock work.  Accordingly, it asserts
that if any such work took place, it was in direct disobedience
of that policy.  It cites the testimony of Hood and Myers that
neither was directly ordered by a supervising officer to
complete the pre-shift work.  It also notes that Hood, Myers,
Geibel, Bogdanowicz, and Jantas all agreed that no officer had
been disciplined for not completing pre-shift work.

        The court finds that plaintiffs have established by a
preponderance of the evidence that patrol officers and patrol
sergeants carried out uncompensated pre-shift work during the
period between October 30, 2011 and November 8, 2013.  Hood and
Myers credibly testified that patrol officers completed at least
ten minutes of pre-shift work.  Bogdanowicz likewise confirmed
that patrol officers completed at least ten minutes of pre-shift
work.  The court finds Bogdanowicz credible and unbiased and
places great weight on his testimony.

        Furthermore, the evidence establishes that this
pre-shift work was expected of patrol officers.  In some cases,
this expectation was explicit:  Hood, Myers, and Bogdanowicz all
testified that they were taught as patrol officer trainees to
set up their cars and equipment before starting their shifts.
Lewandowski, in his deposition testimony, confirmed that the
expectation was "cultural knowledge" that was "instilled" in the
Township's police trainees.  While the court acknowledges that

-14-

the performance of pre-shift work is inconsistent with the
Township's 2010 timeclock policy, it nonetheless occurred.

As for patrol sergeants, Geibel credibly testified to
completing at least some pre-shift work.  There is some
discrepancy between Geibel's claims of forty to forty-five
minutes of pre-shift work and Bogdanowicz's testimony that when
Bogdanowicz was a sergeant, he arrived only fifteen to twenty
minutes early.  Still, the Township has offered no evidence to
rebut Geibel's testimony that he completed pre-shift work nor
any reason to outright discredit it.

Significantly, none of the Township's witnesses
testified that pre-shift work was not taking place.  To be sure,
Jantas said that they never witnessed any pre-shift work taking
place nor completed any off-the-clock work either as a patrol
officer or a patrol sergeant.  The testimony of Mayor Patriarca,
who served in the Township's police department in both
capacities before assuming office, was in accord.  However,
neither testified that no such work was taking place between
2011 and 2013, the relevant period.

On the other hand, plaintiffs have not established
that patrol officers or patrol sergeants engaged in any
post-shift work.  Hood claimed to have completed five minutes of
work after returning his car to the police department lot at the
end of each shift.  However, Hood acknowledged that he typically

arrived at the station between ten and fifteen minutes before 7:00 A.M. or 7 P.M.  Thus, based on his own testimony, his work after returning his car did not extend past the end of his shift.  Bogdanowicz's testimony corroborates that no patrol officers or sergeants completed uncompensated post-shift work. He said most officers would return to the station around 6:40 and were always able to finish unloading their equipment and filing their reports before clocking out at 7:00.  He explained that by "7:00 the cars were flying out of the station, absolutely, to go home."  Bogdanowicz also confirmed that patrol sergeants did not complete uncompensated post-shift work.  He credibly testified that patrol sergeants rarely had to stay past shift's end, and when they did, they received overtime compensation.  The court will credit the testimony of Bogdanowicz to the extent it conflicts with the testimony of Geibel and Lewandowski.

        As for the Township's awareness of the pre-shift work, the evidence demonstrates that the Township had actual knowledge of the pre-shift work taking place.  The court finds that Jantas, the police chief, was aware of the pre-shift work taking place during the relevant period.  Bogdanowicz testified that he directly communicated with Jantas about the pre-shift work.  All the pre-shift work took place at the Township municipal building and its parking lot, a stone's throw from Jantas's office.

-16-

Indeed, Bogdanowicz said that Jantas arrived early at least one morning to witness it taking place.  The court credits the testimony of Bogdanowicz over that of Jantas.

Furthermore, Jantas's awareness of off-the-clock work is imputed to the Township.  The Township cites no authority for the proposition that knowledge of police personnel overtime can only be imputed to a municipality from the individual acting as the "appropriate authority" pursuant to N.J. Stat. Ann. § 40A:14-118.  It would be an insurmountable hurdle to permit plaintiffs to impute knowledge to the Township only from the Township's mayor or business administrator, particularly since those individuals disclaimed any involvement in the police department's day-to-day workplace operations.  Rather, in cases concerning the underreporting of work hours, it is widely accepted that courts may impute the knowledge of an employee's supervisor to that of the employer.  Bailey v. TitleMax of Georgia, Inc., 776 F.3d 797, 802 (11th Cir. 2015); Brennan v. Gen. Motors Acceptance Corp., 482 F.2d 825, 828 (5th Cir. 1973); Stanislaw v. Erie Indem. Co., Civ. A. No. 07-1078, 2012 WL 517332, at *7-8 (W.D. Pa. Feb. 15, 2012).  Consistent with the foregoing authority, it seems eminently reasonable to expect the knowledge of a police chief to be imputed to the Township.

In sum, the court finds that patrol officers and patrol sergeants completed at least ten minutes of pre-shift

-17-

work but no post-shift work.  The Township had actual knowledge that this work was taking place between October 30, 2011, and November 8, 2013.

IV

Even if off-the-clock work was occurring, the Township argues it is not liable because plaintiffs' claims are barred by the so-called de minimis doctrine.  That doctrine bars recovery of "compensation for trivial calculable quantities of work." De Asencio v. Tyson Foods, Inc., 500 F.3d 361, 374 (3d Cir. 2007).  It applies "only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities."  29 C.F.R. § 785.47.  In considering whether otherwise compensable time is de minimis, the court considers three factors:  "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work."  De Asencio, 500 F.3d at 374 (citing Lindow v. United States, 738 F.2d 1057, 1063 (9th Cir. 1984)).  This is necessarily a fact-specific inquiry.  E.g., Garcia v. Vertical Screen, Inc., Civ. A. No. 18-4718, 2022 WL 125906, at *6 (E.D. Pa. Jan. 13, 2022).  Because the de minimis doctrine is a defense, the Township bears the burden of proving its application here.  Walsh v. E. Penn Mfg. Co., Civ. A.

No. 18-1194, 2021 WL 4215503, at *2 (E.D. Pa. Sept. 16, 2021)
(citing Kellar v. Summit Seating Inc., 664 F.3d 169, 176
(7th Cir. 2011)).[4]

While the evidence at trial establishes that
plaintiffs did less uncompensated overtime work than they
alleged in their complaint, the Township has not shown that any
of the De Asencio factors compel a finding that plaintiffs'
overtime work was de minimis.  In its post-trial brief, the
Township focuses only on the amount of time plaintiffs claim
they worked.  However, it has not cited any cases holding that
ten-minute periods of work are too short to be compensable under
the FLSA.  Rather, courts have consistently declined to find
that periods of ten minutes are per se de minimis.  See, e.g.,
Gonzalez v. Bustleton Servs., Inc., Civ. A. No. 08-4703, 2010 WL
1813487, at *10-11 (E.D. Pa. Mar. 5, 2010); Perez v. Mountaire
Farms, Inc., 650 F.3d 350, 373-74 (4th Cir. 2011); Reich v.
Monfort, Inc., 144 F.3d 1329, 1334 (10th Cir. 1998).  When

---

4.   At the motion-to-dismiss stage in this case, Judge Robert
B. Kugler declined to dismiss plaintiffs' FLSA claim on
de minimis grounds.  Stewart v. Pemberton Twp., Civ. A. No.
14-6810, 2016 WL 3466103, at *3 (D.N.J. June 23, 2016).  That
ruling was based on plaintiffs' allegations in their Third
Amended Complaint that patrol officers worked twenty minutes
before and ten minutes after their shifts and that patrol
sergeants worked twenty-five minutes before and fifteen minutes
after their shifts.  The court explained that based on those
allegations, plaintiffs' uncompensated time was "neither 'small
in the aggregate' nor 'irregularly performed.'"  Id.

considered in the "aggregate," as this court must, the amount of uncompensated time is even more substantial.  De Asencio, 500 F.3d at 374.  Furthermore, the other two factors under the De Asencio test undercut the Township's de minimis defense.  The Township cites no "industrial realities" that obstructed its administrative ability to count plaintiffs' time.  See id. Plaintiffs have also demonstrated that they completed pre-shift work with the requisite regularity to defeat the de minimis doctrine.

V

An FLSA plaintiff is entitled to a greater recovery when the employer's failure to compensate was willful.  First, when an employer willfully violates the FLSA, the plaintiff may also recover liquidated damages in the amount of the unpaid wages, although the court may in its discretion abate some or all of the liquidated damages.  29 U.S.C. § 216(b).  Second, although the statute of limitations for an FLSA claim is usually two years, an employer that willfully violates the FLSA is liable for a third year of unpaid overtime wages.  29 U.S.C. § 255(a).  To demonstrate willfulness, the plaintiff has the burden to show that the employer either knew or "showed reckless disregard for the matter of whether" its conduct violated the FLSA.  Stone v. Troy Constr., LLC, 935 F.3d 141, 148 (3d Cir.

2019) (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)).

A separate but related concept to willfulness is an employer's defense of good faith. A district court has discretion to abate some or all liquidated damages if the employer acted in "good faith" and held "reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. The employer has the burden of establishing this defense. It must prove both subjectively that it had an "honest intention to ascertain and follow the dictates of the [FLSA]" and objectively that it "act[ed] as a reasonably prudent man would have under the same circumstances." Brooks v. Vill. of Ridgefield Park, 185 F.3d 130, 137 (3d Cir. 1999) (citations and internal quotations omitted).

Plaintiffs contend the Township willfully violated the FLSA because Jantas as police chief was aware that patrol officers were working before their shifts. As discussed above, the court agrees that he was aware that pre-shift work was taking place, and his awareness is imputed to the Township. Accordingly, the court finds that plaintiffs have met their burden of demonstrating that the Township willfully violated the FLSA.

The Township argues that plaintiffs are not entitled to liquidated damages because it abided by the collective

-21-

bargaining agreement it had struck with its police force and thus acted in good faith.  It cites several cases that it believes stand for the proposition that "a municipality acts in good faith . . . if it retains experienced counsel, negotiates a CBA that is approved by those experienced counsel, and complies with that CBA."

The Township first relies on our Court of Appeals's decision in Brooks v. Village of Ridgefield Park, 185 F.3d 130 (3d Cir. 1999).  That case centered on a village's method of paying overtime.  Pursuant to a collective bargaining agreement term that the village employees' union had requested, the village agreed to pay overtime compensation to its employees on a deferred schedule.  Although both parties had consulted with and relied upon labor counsel in negotiating the agreement, the overtime payment schedule nonetheless violated an FLSA interpretive bulletin.  A group of police officers sued over the overtime payment schedule.  The district court granted summary judgment for the plaintiff police officers, holding that the village had violated the FLSA and had not acted in good faith. In so holding, the district court cited evidence that the village had not taken any affirmative steps to ensure that the payment schedule comported with the FLSA.

Our Court of Appeals reversed the district court's finding that the village had not acted in good faith.  The Court

-22-

noted that the village was not accused of violating the FLSA's "mandatory core requirements" dealing with "minimum wage, hour, and record" keeping.  Id. at 140.  It also emphasized that the village's employees' union had consented to the overtime payment schedule and noted that the deferred payment schedule "served the convenience of [its] workers."  Id.  Thus, the Court held that although the record reflected the village had not affirmatively investigated whether the payment schedule was lawful, the district court still could have found that the village acted reasonably and in good faith and remanded the case for further factfinding on that issue.

Brooks is distinguishable from plaintiffs' suit in two key respects.  First, the Township violated a "core" component of the FLSA by not paying plaintiffs fully for the work they performed.  Second, plaintiffs are not seeking to repudiate an agreed-upon collective bargaining agreement term as the plaintiffs did in Brooks.  Patrol officers in the Pemberton Township Police Department did not agree to forego overtime payment that the FLSA requires.  The Township argues that it acted reasonably because the police union failed to object to the pre-shift work when it negotiated with the Township and assented to their collective bargaining agreement.  This argument is without merit.  The Township could not have

reasonably believed that the practice of pre-shift work without compensation complies with the FLSA.

None of the other cases the Township cites supports its position that its abiding by a collective bargaining agreement is evidence of good faith.  In Rudy v. City of Lowell, the city violated the FLSA by excluding certain regular work time when calculating overtime payments.  777 F. Supp. 2d 255, 263 (D. Mass. 2011).  Featsent v. City of Youngstown also involved a city's miscalculating work time for the purposes of determining overtime payments.  70 F.3d 900, 906-07 (6th Cir. 1995).  The cities in both cases adopted policies that violated the FLSA but only after reasonably relying on the advice of counsel.  The Township has exhibited no reasonable reliance here.  In Cahill v. City of New Brunswick, the court found that the city's efforts to investigate its unlawful delay in overtime payment created a triable issue of fact with respect to whether the city had acted in good faith.  99 F. Supp. 2d 464, 477 (D.N.J. 2000).  Here, despite Jantas's knowledge of the pre-shift work taking place, there is no evidence that any Township official took any steps to prevent the pre-shift work, of which it was aware, until after Hood's injury.

VI

For the aforementioned reasons, the court finds that patrol officers completed at least ten minutes of pre-shift work

-24-

during the period between October 30, 2011 and November 8, 2013. The Township, through its police chief at the time David Jantas, had actual knowledge of that work.  Thus, the Township is liable for a willful violation of the FLSA.

    As mentioned above, the parties have stipulated that if the court "finds liability" against the Township, "damages are $26,308.67."  This figure includes damages during the third year back from the complaint, between October 30, 2011, and October 29, 2021, to which the plaintiffs are entitled based on the court's finding of willfulness.  It does not include liquidated damages.  The court will award liquidated damages and double the damages owed to plaintiffs.  Thus, the court will enter a judgment of $52,617.34 so that each plaintiff will receive double the amount set forth in the parties' stipulation.

    The parties shall submit a form of judgment in conformity with the court's findings of fact and conclusions of law.